Good morning, your honors. My name is Jeff Schwartz. I have the great privilege to represent Patrick Miele in the appeal of this matter. I would like to reserve time for rebuttal. The issue that we hear this morning is basically one primary issue and a couple of sub-issues. Mr. Miele's right to a trial was taken away. The method, the standard before this court is already briefed, but I want to address what was stated before Judge Breel at the day of trial, which is the issue of standing. This court has looked at that issue and made a decision in case number 0556582, and that's set forth at excerpts of records 164. In that proceeding, the appellate brief at pages 19 through 27 looked at the issue, and the appellee in response at page 14 simply stated, it wasn't before the court, so we should not be worried about it. But that's something that is done for every single case, and this court had the opportunity. We went through the proceeding, and at the whim of the district court judge said, we don't have it. As a matter of fact, it was not before the suggestion of the judge that the appellees actually raised that, and we look at that at excerpt of record 157. Furthermore, the appellees didn't even move for summary judgment until the district court judge said this may be a matter for summary judgment. What is not dispute about this particular matter is that in the investment of the film, Grapsody, the appellant put nearly $500,000 of his money into it. Everybody received money, the defaulted co-defendants, the appellee. He did not receive a single dime. Looking to the issues, which is the key. You put in $500,000 and got nothing back. Zero back. The appellant got over approximately, it's disputed how much he got, and that's one of the issues in the court. As set forth in the record in his deposition testimony, the deposition testimony of the bookkeeper, in the actual record keeping, it seems that there was substantial other funds. We have in the record reviews with Mark Bruder, that we have special deal between us, a mutual agreement. Let me ask you a question. Did he sue Bruder? We did sue Bruder. And what happened? Because it sounds to me like Bruder is the person who had the authority to sign this deal with Blockbuster, and he's the one that he or his business, I guess it's the business, signed the distribution and rights arrangement. Bruder was sued, and there was a motion, a 12B6 motion brought by him, and the court determined in favor of Bruder. They found that there was so no privity to Bruder as to the money that Pearlstein was absolutely in charge for. If you look at the record, many times Pearlstein said he's the managing member. He was responsible. He had the fiduciary relationship. And going to the fiduciary, look at an excerpt of the record 56, which sets forth the fiduciary relationship, and if you look at excerpts of record 123 through 125, it shows how it's been breached. Pearlstein tries to get away from that fiduciary that it was antiquated measures. Maybe I should have been more specific when I did that. But clearly, unequivocally, he had that duty, and he did not fulfill it. Now, let's say for argument's sake, he didn't have a fiduciary. Well, that is an issue which should be before a trier fact. He was summarily taken away from the appellant by the judge. Counsel, I'm kind of confused by this record. First, your client didn't want the blockbuster deal. Then he wanted the blockbuster deal, and then he said he would do everything to help to close it. So the blockbuster deal was that they sold everything for $200,000. Is that right? That's correct, Your Honor. That's all I'm asking. That is a correct part of the record. It is a correct part of the record, but at no time did Mr. Mealy want the blockbuster deal. No, that's not accurate in that he said he'd help to close it and all this stuff. Mr. Mealy did not help to close it. As a matter of fact, as soon as he realized what this was, he sent an oral statement, which less than 12 hours later, said this is not what it's going to be because at that time it was $250,000. Brewer was going to get $50,000, and Pearlstein was going to get the first $200,000. Well, Pearlstein put in $300,000, didn't he? Pearlstein put in $300,000. He says he may have put in more. There's no evidence to the fact. So it's not like Pearlstein came out of this smelling like a rose? Well, exactly. Pearlstein never smelled like a rose in this thing. Well, I'm talking about his money. We've got a lot of roses out here, though. This, to me, is very confusing because there is, Tess, something in the record that your client said he wanted the blockbuster deal to go through and wanted to help close it. Well, Judge Fletcher, thank you for saying this is confusing. Because the fact that it's confusing to this Court says that this is a matter should be heard with all the evidence before a jury. That was taken away. If there is an issue, whether it be, and as a matter of fact. Well, now, you are saying today that he never wanted the blockbuster deal? I am saying today that there was a meeting in Mr. Pearlstein's office, an oral meeting where he says, here's the blockbuster deal, the best we can get done. You know, I don't want all this explanation. I just want you to tell me, did he agree to the blockbuster deal? There was an extraordinarily brief time, less than a day, when that deal, which I'm going to argue was duress, was put before him. When he came to his senses, immediately he said no, he sent a cease and desist letter and said don't do it. And from every point forward, he objected to this blockbuster deal. As a matter of fact, when we look at the blockbuster deal, he never received that contract well into this litigation. He never actually knew what it was. And there's still a question, whether that blockbuster, what that is. Three specific causes of action. Fiduciary duty, we talked about. Commingling of funds, the record is complete with that. Let's look at the side deals. The side deals by Pearlstein and Brunner and anyone else set forth in the record at 66, 124 and 148. The second cause of action which was taken away from him was interference with prospective advantage. If you look at it, it's excerpt the record 51 that sets forth the agreement, excerpt the record 128, it sets forth the other agreement that was taken away. Now, appellees have argued prospective advantage. Well, it really wasn't the soundtrack, it was embodied music. Okay. We disagree with that, but Mr. Mealy, the appellant, had no right to talk about that. Whether or not the full soundtrack was embodied music, an issue of fact, a substantial issue of fact, which was taken away, which should be heard in a full evidentiary proceeding before a jury. The issue of usury. Look at excerpt the record 144, 145, 147 and 164. In each of these instances, Ronald Pearlstein acknowledges he was receiving between 50 and 100 percent interest. At excerpt the record 141, there was an issue, was it a loan, was it not a loan? He says, that's more than my loan. So clearly, at 46 to 48, reference to the loan. At 71, 72, reference to the loan. At 80, 89, reference to the loan. The testimony of the bookkeeper. Excuse me. If he puts in $300,000 and he gets back $200,000, how is he made 100 percent interest? Okay. I mean, this doesn't, I don't know. Thank you for your inquiry. The fact remains that let's say he put, he said clearly in the paperwork, in the memorandum of understanding, at excerpt 38 to 49, and at the operating agreement at 52 to 59, says forth, I get 200, I put 200 in, I get 300 back. So. No, he put 300 in and he got 200 back. But that's what he's testified, Your Honors. Wait a minute. Wait a minute. Did he put in 300 or did he put in 200? Well, Your Honor, looking at the bookkeeping, which he admitted was pretty unclear, it's clear there's 200. He says he put in 100,000. In the excerpt of record, in his book, it is unclear how much. I'm going to give him the benefit of the doubt and say. Assuming he put in 200 and he got 200 back, that still doesn't add up to 100 percent interest. Right. He might have gotten 100 percent of his principal back with no interest. You're absolutely right, Your Honor. This is what he's saying. What the appellant. Okay. I see you're shaking your head. Let me see if I can clarify the conclusion. Well, because I'm confused as to Dickens. Okay. Well, let me see if I can take that confusion away. What the evidence shows is set forth in the record and the 120 trial exhibits, which were ready on the day of trial, was that not only was there a blockbuster deal, there was ground zero, there was Visions Entertainment. The appellant had purchased this video in Germany, in England. Mr. Pearlstein says, all I got was $200,000. The testimony shows that he had accounts where he got money into different funds. We haven't had the opportunity to be put forth before a jury to say Mr. Pearlstein didn't get only $200,000. There would be testimony of co-defendants, which were not allowed, that there was a $2 million payment on this deal. So while he says over and over and over again, I put 300 in, I got 200 out, I lost on the deal, that's his testimony. We have, and we plan to produce at the time of trial, evidence to show that's incorrect. Maybe I'm wrong here, but I thought this appeal was about whether the defendants in the case, Mr. Pearlstein in particular, had the authority, assuming he did do this, because there's allegations that Bruder did it and not Pearlstein, sign this rights over to Blockbuster. And now you're talking about some deal in Germany and some video here and something else going on someplace else. What does that have to do with it? Well, it has everything to do with it, Your Honor. What this appeal is about is allowing the appellant his day in court. It was taken away. There are three causes of action. There are facts related to the cause of action. There's evidence of the cause of action. He, and the fact that... But just because you have evidence doesn't mean you're entitled to a trial. I understand, Your Honor. But the fact that if there was a viable cause of action, and there's evidence to support the action, maybe conflicting evidence, he does have the right to a trial. He does have a right to a jury trial. There is, this is not something that occurred haphazardly. This is something that has been going on now for eight years. This is not a 30-cent thing. It's $500,000. Mr. Pearlstein would want to argue that he lost money, too. Did he depose the plaintiff once? Did he conduct any discovery whatsoever? No. He just figured, I'm Ron Pearlstein. I have millions of dollars in my bank account, which has been testified to. I commingle funds, which has been testified to. I'm above the law. Mr. Mealy did not have the right before trial or fact to set forth what his cause of actions are, what the evidence. He has the evidence. He was prohibited. He was prohibited by this judge, this district court judge. This district court judge used every opportunity he can to take that right away. As you see by the record, I'm not going to go into the other two cases. He gave him, when this was remanded back to Judge Reel, he said we'll have a trial in 90 days. There was no answer on file. This court, we writ this court and they granted it. Mr. Mealy will not have a fair trial before this court, before the district court. We're asking for two things, the right to a jury trial and a right to have it before a different judge. I'll reserve the balance of my time. Thank you. Thank you, Your Honor. I have a little nagging problem hanging around. When it kind of came up to us, not all of the defendants were dismissed out of the case. So I'm not sure it's even ripe for us. Your Honor, I believe the other defense were defaulted, Your Honor. So there was no need for a 54B certification here? That's correct. That's what you're saying? That's Pittman, Abilene, and Davey. So there's nobody left? The people left is Mr. Pearlstein and Danko. And that whole issue in the check. Well, I'll tell you, though, Judge Fletcher is absolutely right. The record doesn't reflect that. Then maybe this does need to go back down to the court for clarification. Thank you, Your Honor. I want to say that it has been a privilege to avoid the opponent, and I appreciate the work that Ms. Abb has done. Thank you. Good morning, Your Honors. Wayne Abbott, appearing on behalf of defendants. For me, the overriding issue, which overlaps all of the other issues, is the issue of standing of Mr. Mealy. The product in this case, the film Rhapsody, belongs to the LLC that was formed. You have the LLC operating agreement in your record. Mr. Mealy has not suffered any individual harm. The cause of action exists. This was a limited liability company, correct? That's correct. It's a little bit different than a major corporation, right? Generally, the case law, as we set forth in our brief, treats limited liability companies in the same way. Has the California Supreme Court or any court of appeals specifically dealt with this issue? I don't know that there's any specific case on point. What do you think the California Supreme Court would say? I think they would say that this cause of action, the product, the film, belonged to the LLC and not the individual members. When was this first raised by you? We did raise this issue originally in the 12B6 motion, but my reaction to the comment made in the argument advanced by counsel is that at that early stage of the pleading of the case, rather, the standard of review by this court is completely different, and the standard of review by the district court would be completely different. The issue at that point is, could he later on prove up a case? Could he later on produce suspicion evidence? I understand that. Now, you did raise it in the 12B6. Did you re-raise it at any subsequent point? Only upon request of Judge Reo. That's right. But certainly we would have raised it by way of an affirmative defense. Let's assume for a moment that Mr. Pearlstein, I mean, Mr. Meely, has standing and get to the merits. Well, he keeps talking about all of the evidence that he would have presented at trial and that he was denied from preventing. Well, nothing stopped him from presenting the evidence in his summary judgment motions. They were cross-summary judgment motions. So there was a cause, for example, there was a cause of action for breach of fiduciary duty, I guess, amongst the signatories to this agreement. Right. So what would he have to show to establish a breach of fiduciary duty? What are the elements of that claim? We believe he would have to show that a specific duty of a fiduciary nature was owed by Pearlstein to Meely. He hasn't shown that. And he'd also have to show that personally. Has he ever alleged what the duty was? No. And, again, he keeps saying he would have presented evidence, Europe, Germany, whatever. He never did. And nothing prevented him from doing it in the motion for summary judgment. And on the issue of usury, that would be the case. He's got several other claims. One was preventing him from economic depriving of an economic advantage. Well, I can't tell to me his pleadings and his appeal are somewhat unclear. To me, there has to be a third-party contract that's being interfered with. Well, what does California law require? A third-party. Not to you. Not to me. California law requires that there's an interference with a contract with a third-party. What evidence did he present on summary judgment? None. None. Okay. He has a claim for usury. What does it take under California law to establish a claim for usury? It takes a note, an obligation, an absolute obligation to repay the note, and actual payment. Well, what's the evidence of a note here? There is none. In fact, the operating agreement and all of the agreements that are of the record talk about the money Pearlstein put in as an investment. But even if you categorize it as a note, let's just say for the sake of discussion right now, it's a note nearly never paid any money. So how could it be usurious? No money was ever paid by the plaintiff. It all dovetails back to the issue of standing. And Judge Rial was right for calling for briefing on that issue. I don't think that's such a clear-cut issue under California law. I disagree with Your Honor. Well, you can't point to any cases. I know, but it all comes to... To say that it's a clear-cut issue, you at least have to be able to point to some case law or a statute. We thought we did in our briefing, Your Honor. If this film could have earned a million dollars, let's just assume that hypothetically is true, and Rhapsody LLC is awarded a million dollars, then the funds are dispersed according to the operating agreement. That million-dollar profit doesn't mark the... What ever happened to this film? I have a copy in my trunk, if you'd like to see it. Quite frankly, I found it... There it is. I found it unwatchable. I was joking with my associate. I said we ought to have the panel see if they could get through it. Your able opponent is apparently enthralled with it. He carries it wherever he goes. All of this is conjecture. It's speculation. The opportunity to present all that evidence was, in fact, given to him. Look at his motion for summary judgment. Where is all this so-called evidence? I know you're disappointed with the fact that I cannot cite you absolute authority relative to the issue of standing in the LLC, but that question keeps arising whenever we discuss all of these other areas. He says it's usurious. Who paid him the usurious money? What about the proper defendant? Because that was also an issue. Now, he sued your client. I guess this does go back to standing to some degree. But the agreement itself, the authority, the clear authority, it appears in the record, doesn't seem to be very much contested. To sign the blockbuster deal, was this, is it Bruton or Burton? Brutter. Brutter. All of the members signed the agreement. Including Mr. Miley. Miley. So Mr. Miley signed this agreement, and Brutter goes ahead and sells this off to Blockbuster, and then Mr. Miley says, wait a minute, this is awful, and so on and so forth. After the fact. So it would appear, unless there's something there that I'm not seeing, that if you have an agent that goes ahead and does something for you that is unauthorized, that the appropriate defendant is not your co-investors or whatever, it would be the agent. I couldn't agree more. But then he's saying that Judge Reel said the agent isn't the right defendant. So, I mean, how can it be both ways? Well, I came on to this case because original defense counsel was disqualified. So I wasn't present in the case when that happened. But you know what the record is. What happened with respect to these people? Because apparently he sued them, and then Judge Reel said, well, they're not the right defendant. Seems to me like he would be the right defendant. I think he might be. But that's not why I'm here on this appeal. But your client isn't the right defendant. He's not. And certainly his wife isn't. And certainly Danko is not. Did anybody appeal the dismissal of Brutter? No. That was never appealed. I have no idea. I didn't represent the man. I don't know. Well, you were in the case. I was not in the case at that point. No, but you are now. You're not defending an appeal. I don't know why Brutter never appealed. No, Brutter wouldn't appeal. Brutter's delighted. I don't know why the plaintiff didn't appeal that. I don't know why. You perhaps should ask Mr. Schwartz. All right. Counsel for Mealy apparently wrote a letter saying that Mealy wanted to help close the deal and that he wanted to help. Now, is that accurate, that there's a letter in the file to that effect? Yes. It's in the supplemental record. The letter's dated May 7th of 2002. What did it say? Do you want me to read it into the record? Yes. Yes. Please be advised this firm is counseled for Mr. Patrick Mealy and this letter serves to address the pending transaction between Rhapsody, LLC and Blockbuster. We understand that Blockbuster's offers to purchase the fill known as Rhapsody was accepted by you on behalf of Rhapsody, LLC on or, my copy's a little bad, about probably April 24, 2002 and subsequently confirmed to you in writing. We are inquiring as to whether formal agreements have been received from Blockbuster for the transaction and or when you expect to receive such documents. If the agreements have already been received, please forward the agreements to the undersigned at your first convenience. Please feel free to contact the undersigned with any question or comments or if we can offer any assistance in the transaction. This is underscored with emphasis. Please be advised that Mr. Mealy continues to support the transaction and intends for it to proceed to close and wishes to offer his assistance in that regard. This letter is very true to yours and it's signed by Attorney Michael Eisner. That was it. That seems to close the door to me. Anything else, Mr. Abt? No. Okay. Nice to see you. Just very briefly, Your Honor, we stand on our papers. I think the argument presented is clearly set forth what we're looking for here. We respect this court as has acted before to give Mr. Mealy his day in court to answer these issues which the judges had and we request that it be going to a different judge. Thank you for your consideration. Thank you. Thank you, Counsel. We appreciate the arguments on both sides. The matter be submitted? Yes. Then we go to our next case.
judges: Ezra, Fletcher B. , Paez